The next case is Kenneth Johansen v. Bluegreen Vacations Unlimited. Benjamin Hogan is here for Bluegreen Vacations. And once you're all settled there, Mr. Hogan, you can begin your Good morning, and may it please the Court, Benjamin Hogan on behalf of Kenneth Johansen and the plaintiff below. In denying class certification, the District Court abused its discretion by categorizing that if a consumer uses lawful investigative techniques to do exactly what Congress intended and uncover violations of federal law, then they are precluded from serving as a class representative of people with identical claims. There are three problems with this ruling. First, the District Court's decision rests on a fundamental misunderstanding of how and when a claim arises under the TCPA and what a consumer must do to bring such a claim. Second, the District Court abused its discretion by misapplying the typicality adequacy standards under Rule 23. And third, the District Court gets the congressional purpose behind the TCPA exactly fast. Its decision writes a playbook for telemarketers who avoid any meaningful liability. Obfuscate who you are and who you're working for as the agent, and you will not face any liability under the TCPA in any meaningful sense. It will not stand. The District Court's decision below takes away one of the only tools that consumers have for finding out who is behind TCPA violations and bringing those claims. It leaves them with two untenable options. One, they're left not knowing who to sue. Two, if they do an investigation to find out who's behind the calls, both the agent and the principal, then they're left, like Ted Johnson did here, then they're left with the position that we're in here. And you cannot bring a case on behalf of a nationwide class for abuses that are identical to his claims. There's an exception to liability if the consumer and the caller have an established business relationship. So, I mean, doesn't playing along on the call give the caller a reasonable basis for believing that they had an established business relationship? And I'm trying to figure out this record. I mean, did he previously purchase a vacation package or not? No, he did not previously purchase a vacation package. And he makes that clear in his testimony and in his declaration. And there was no finding of fact that there was any inconsistency in that. And let me be clear. You're talking about not even 10 years ago or 20 years ago. Correct, not even 10 years ago. When he said on the phone call, I purchased a package before and have a credit, that was a misrepresentation. Judge Hall, I think that that was the representation by the telemarketer. I thought it was a transcribed phone call. It was a transcribed phone call. And in the transcribed phone call, the telemarketer said, you have a credit with us. And Mr. Johanson replied, wow. He had never heard of Blue Green. I thought he went further than that and said, yes, I did have a credit that I went before. I mean, we have a transcript of the call. I mean, so I can read it. So tell me what it said. Yes, in the transcript, he did. He did play along. Because he told him he had taken, had a trip with him before. Correct. Okay. We're trying to see if you have a business relationship. If anybody could possibly perceive on the phone call, you established a bit, that's the question. Right. And why does that phone call not give rise to at least, the district can make fact findings and class certifications. You can agree with that, don't you? Yes. Okay. So they made a fact finding. He played along and deceived him in thinking he had a phone call. He'd had a previous relationship. Why is that clearly erroneous? That's clearly erroneous because the regs for under 64-1200 explain that an established business relationship only arises when a consumer makes an inquiry or a transaction with the company. And that only lasts for, in the instance of an inquiry, for three months. All right. So I'm confused now. Did he previously, he might've said on the call, yeah, wow, I have an unused credit. But did he have an unused credit? I mean, what does the record reflect of whether or not, I mean, did he have it? Did he previously purchase a vacation package from Blue Green? No, he did not. And the marketing director explained that the credit was a ruse. The credit was put on their account. And this is a quote, because in marketing, there's a concept for fear of loss. And so you create the fear of loss. You create FOMO in the consumer so they engage. And even if he had purchased a vacation package, which he did not, 10 years ago. Blue Green agrees that he did not? Blue Green agrees that he did not. Even 10 years ago, that he's never. The lead came from a different place. And Mr. Johanson, as I said, explained in his testimony and in his declaration that he has never purchased or had any relationship whatsoever with Blue Green Vacations. Did Blue Green have a reasonable basis from some of the paperwork to think he had purchased one 10 years ago? Or is that missing too? So that goes to the definition of the class. Mr. Johanson's lead was procured from an entity called the Welcome Center, who basically sold leads to Blue Green Vacations. And that's what they, that was part of their list of who they were going to call. And in 2020, they testified, their representative testified that they quit scrubbing those leads against the Do Not Call Registry. And importantly, Mr. Johanson's lead, like every class member's, is prior to 2013. And that's important because in 2012, the FCC explained what's required for having prior express written consent. And so all of the consents, the purported consents, will rise and fall on the same legal theory and on the same facts. And they still to date have not produced a consent form that has Mr. Johanson's name on it. It doesn't have to be written consent. The case law is clear. You can consent by your verbal actions during the call. It doesn't have to be in your written consent. No regulation says it has to be in writing. The FCC explained in 2012 that it has to be prior express written consent to call people on the Do Not Call Registry. That's not what the consent I'm talking about. I'm talking about consent during the call, that you can consent during the call to it. But you cannot consent, even if that's true. No, but just stop there. Can you consent to the call during the call? Can you consent to it by your conduct during the call? No, consent is not retroactive. Okay, I understand you take the position. Once that phone is picked up on the second time, we got that. They had a 30 second call. It was nobody happened, answered, hung up, whatever. Next call, your position is as soon as that phone's answered, it's a violation. That's not what I'm talking about. Let's assume for sake of argument, that's not entirely correct. It depends. Maybe it is, maybe it isn't. Can you consent during the call to affect whether that's a violation? That's my question, by your conduct during the call. And just to make sure I understand the question, for consent for future calls? No, to the call about which you are engaging at the time. It may start out a legal call, but you convert it into a call because you engage in the call and you consent to the conduct. You don't say, as I do when they call me, don't call me back, okay? Never call this number again. I've told you five times. I don't engage in the call. Hi, I'm blah, blah, blah. Do not call this number. It's dinner time. That's not what I understand. My question is, once a call comes in, is the violation all right? Nothing else happens. But if you don't do that kind of thing or something similar or whatever, hang up, a lot of things, and you engage in a 30-minute call, giving out your contact information, I don't care whether you're deceptive or not, whatever it is. Maybe you're deceptive, maybe you aren't. Maybe you're just having a conversation, just kind of seeing where it's going. Maybe you're having fun, whatever you're doing. But can you then consent? Can you trigger a consent to the call to vitiate the violation under the law? What tells me that? The regulations and the case law, for example, with respect to an EBR, and we address this in our briefs, with establishing an established business relationship cannot be done on a call that was in a legal solicitation in the first instance. I'm not talking about established business relationship. That's a whole different thing. The same is true for consent, Your Honor. Consent's a whole other thing. But the same is true for consent. Okay. I thought your argument, at least the argument that you made in your brief, was that, well, I'm playing along. It's a consent because I'm trying to figure out who the caller is, because that's the only way I can determine the identity of the caller. That's not your argument? That is our argument, but not that consent is the basis for the investigation. Playing along does not provide prior express written consent for the call that already violated the TCPA. So, in other words, if the consumer says, yes, I do have an unexpired vacation package for the purpose of determining who the caller is, what's the response to that? Is that consent to the call? No. No, absolutely not. The consumer cannot initiate of the wrong that has already occurred. I mean, and again, this is a critical component of the reason that Mr. Johansson stayed on the line for 30 minutes with them. Your argument is that it is for the purpose of determining who the caller is. Who the caller is. And CFR 64-1200-D4 requires telemarketers to identify both themselves and the seller. And the only time, the first time that Mr. Johansson identified the caller, Schumer Management Consulting, was when he received the confirmatory email that it was Schumer calling on behalf of Blue Ring. Of course, he could have just, rather than play along, he could have said, okay, now tell me who you are now and give me your address. Tell me exactly who you are now. He could have done that. Your Honor, that's true.  You can answer the question. That is a typical thing that happens in the Telephone Consumer Protection Act space. And when consumers do that, when they start probing, the telemarketers shut down. And if you read the transcripts, in this case, the June 2 transcript, that's exactly what happened when Mr. Johansson said, where are you calling from? Who are you calling on behalf of? And it was, they are, that is the game that they play. It is an effort to obfuscate who is behind the call and who, because in a vicarious liability case, if you can't identify both the agent and the person, then you don't really have a vicarious liability claim. He played along and got the confirmatory email, which are Exhibits 5 and 6 to Mr. Schumer Management and Consulting was revealed as being the calling party. They said at the beginning, we're calling on behalf of Blue Green, but they didn't say who they were. And the only way he found that out was by using his expertise and knowledge in this space. I want to make sure I understand your case. And the first complaint you said, I'm only serving on these calls. I'm not relying on these other seven calls, I guess, nine calls. Is it seven more or nine? It was five additional calls, Your Honor. Excuse me? It was five additional calls after the first two. After the first two, okay. I'm serving on only the two. I'm not relying on these other five. And you amended your complaint and you sued for damages for all seven calls. Is that correct? I know you've changed it. I'm talking about with the complaint. Right. And the district court, you never withdrew that. And the district court ruled. And it's only on appeal, you're now saying you're willing to stipulate, oh, no, I'm not suing for what's in my complaint. I just want you to focus on the first two calls. Is that kind of how it went down? The second complaint does not have to express a disclaimer that the plaintiff is not seeking damages for the subsequent calls. But there's no requirement that a plaintiff disclaims. I don't know what the result is from it. I'm just trying to understand. The second complaint sought damages for all of the calls. So, let me be, I'll try to answer that a little more. At least as written on its face. Let me narrow it. The disclaimer was not. Yes or no? No. Okay. The disclaimer was removed. But the call in the request for relief. Into violations of the TCPA. And that's an error for our request. Wait a minute. It didn't say violations to the TCPA and only two calls or anything. Right. But it clearly says damage to this relationship. And that's an error in the request. Which is what the other five calls did. Right. And if that's so, then they can't get damages because they wouldn't be violations of the TCPA. But the district court treated the whole case as a seven-call case. Correct? Because the disclaimer had been removed. That's correct. And he ruled on the whole case as a seven-call case. That's correct. Okay. And only on appeal did you say, no, you didn't alert them in the district court. No, no, no. Don't treat it as a whole seven-call case. We just want it as a two-call case. You didn't do that in the district court. We did in the first medical complaint. And quite frankly, it was. I'm talking about the briefing on the class cert. In the class cert, it was not an issue that came up. I know. But you didn't, in the class cert, come forward and say, oh, we just wanted to class certify us to these two calls. You did the whole bargain. But now on appeal, you kind of see the five-call problem, for lack of another word. So you're saying, oh, we just need to do the two. Well, yeah, under Rule 8, I mean, that's... I'm not saying whether you can or not. I'm just trying to understand if I don't have it right. You need to tell me how I don't have it right. Yes, that's correct. Okay. I see my time is up. Thank you. Thank you, Mr. Hogan. Ms. Mead. Thank you. May it please the Court, Grace Mead and Veronica DeZayas from Stern-Swever-Miller on behalf of Blue Green Vacations Unlimited, Inc. The district court properly exercised its discretion in finding that Mr. Johanson's claim was inherently different from the class member's and that he was inadequate. Let me begin with the fact that Blue Green did produce evidence he had a business relationship before the call. Blue Green produced business records showing he had purchased this credit in 2010. That's DE 37, paragraph 11 in Exhibit D and DE 72-12, paragraph 7 in Exhibit A. So he has a... He's got a... He testified in a sworn statement that he never previously purchased a vacation package. So what do we do with that? Well, he testified inconsistently. Let me give you another data point, which is at the beginning of the transcript, these are the words, the operator uttered, DE 10-1. My name is Stacy. I'm calling on behalf of Blue Green Resort in regard to a vacation package purchased from us back in November of 2010. And it was go to Charleston for three days and two nights. Do you remember doing that? And he says, no, not specifically. And Mr. Johanson, from that point forward, out the gate, is inconsistent, only consistently inconsistent about whether he had that credit. At times, he says, I don't remember. At other times, he denies it. Across three separate declarations... So where's the evidence, again, in the record that he previously purchased a vacation package? That is DE 37 and DE 72-12. It attaches business records. It's the declaration of David Doucette, who was deposed, the vice president of database marketing. The district court relied on the transcript itself. And that evidence is testimony from Blue Green executives? Correct. David Doucette, the vice president of database marketing, and he was also deposed. What was it, a paper document evidencing it, or just declaration? It was a declaration, and it attached printouts from the concierge computer system that stored information from the alliance computer system that was in effect in 2010. And what, we know it's declarations of testimony, but what is actually the physical document, a computer printout? It's a screenshot. And what does it say? The initials ACT, which meant active. And then when we got to the broader class, this wasn't discussed in the briefing to any extent, but they took 15 depositions here. And there was extensive testimony that this package was ready to go. It was good to be activated. And he had active credit. And in the reply, they concede this would be a fact-intensive question. Well, the district court says, yeah, that's what makes it inherently different. The other thing is, the district court correctly interpreted this. Okay, well, all right, now wait a minute. I'm getting confused. So you're not claiming he ever took the vacation. You're just saying he had an active credit where he could have taken it? Correct. Okay, all right, I'm now. Well, wait a minute now. I'm a little confused. Don't you have to, there has to be some request on his part as a consumer for a vacation package, right? In 2000? Yes, he purchased in 2010. How much did he pay for it? I don't recall. It wasn't much. It was in the low hundreds. Okay, he paid for it, and you've got evidence in the record that he paid for it? Correct. It's even clearer in the summary judgment declaration. Mr. Giussette had two declarations, but it is in the DE-37 declaration. And the district court here had the summary judgment briefed. And he was looking, for example, on the standing issue to our summary judgment motion. And it makes sense because a decision like Vega VT Mobile, they look at how is the class representative's claim going to be proven out, and how does that compare to the proposed class members? So if you have an established business relationship, then Blue Green could call him as many times as they want. Correct, until he makes, in the 2005 FCC order, they say until you make a company-specific do not call request, which he finally did at the end of the June 2nd call after engaging on the two long calls for a total of 50 minutes. And he was never called again. And the second amendment of the complaint was very clear. They were making a 7 to 9 call case. They alleged, quote, on Blue Green's behalf, she replaced at least nine telemarketing calls to Mr. Johanson. That's DE 74, paragraph 32. Paragraphs 33 through 38 then spell out each and every call all the way until the June 2nd call. And then in paragraph 70, and this is DE 45, this is DE 74, they write, as a result of defendants and or its affiliates, agents and or other persons or entities acting on the defendant's behalf, not violating the TCPA, plaintiff and members of the class presumptively are entitled to an award of up to $1,500 in damages for each and every call. Paragraph 70, again. So that means, let's assume they were right that he didn't have a crowd going into the May 27th call. He created an established business relationship on that May 27 call, which means those later five calls in the June 2nd call fell within the established business relationship exception. And that makes him quite different from any other member of the proposed class. Or any of that member, at least. You know, in their appellant's brief, they accuse us of widespread illegal telemarketing. In the appellant's brief, we pointed out that their expert was given, again, lots of discovery here, 82 million call records. And he could not identify a single person other than Mr. Johanson who either, you know, who was on the DNC list, who had not consented, and did not have an established business relationship. And Mr. Doucette's declaration, which I cited to you previously. Well, the district court just set aside the established business relationship. Let's assume that there was no established business relationship. The basis for the district court's denial of class certification because of typicality is because he was deceptive in his effort to establish the identity of the caller, right? Well, on typicality, the injury is independently caused by him. And it limited his standing. And I think if you look through Cordova and Moransky and a lot of these decisions, Swan v. Secretary of State. Yeah, but what I'm asking is what influenced the court was his deception, right? It did, and on adequacy, even more so. So that means every member of the putative class has to determine the identity of the caller the same way, by deception, in order to establish typicality? No, I think that the district court was saying they cannot have independently caused their own injury. In other words, Mr. Johanson testified that by engaging the caller and playing along, he caused every harm this court has recognized as under Article III in the TCPA. He testified to this. I caused it to take longer. I caused it to be a greater invasion of my privacy. I caused it to waste my time. There was nothing left that is protected under Article III. It created a traceability problem. But again, setting aside the exception for an established business relationship, his argument, as I understand it, is that when he got that second call on May the 27th, as soon as he answered the telephone, he was on the do not call list, the violation took place right then and there. Well, again, Would that be true if he had no established business relationship? If he had no established business relationship, there would be a statutory violation on May 27, and then there would be a question of traceability for every call forward at the very least. I thought part of what the district was saying is that all this deceptive conduct would create fact issues that need to be resolved about like standing, injury, traceability, causation, that would make his case so complicated that he would not be, it wouldn't per se be deceptive. I mean, maybe you've got to be somewhat cagey to get them to tell you who they are. I thought that this was more than just a little bit. I thought the district was trying to say, look, this is going to create all kinds of fact issues on threshold issues that makes him not, it makes him atypical. It wasn't just per se if you do deception, you're not a good class rep. But this course of conduct here, particularly because this complaint had nine calls, is going to make this all much more complicated than I get these two calls. And we've got the courts, don't call me again. I mean, you've got those class people who got real simple claims who have very simple common issues of law and fact. And this is why all this is complicated. Correct. It's very analogous to how the Seventh Circuit held NCE design. And there there was an issue of consent and the plaintiff's principal testified I had consent and there were business records to the contrary. And the Seventh Circuit there wrote that affects both typicality and adequacy because there will be extensive cross-examination on these topics. There will be an extensive exploration of the factual issues underpinning that. And that affects both typicality and, again, adequacy because they can disserve absent class members by presenting a claim that is so unusual. And just before we go a bit further here, Mr. Johanson did falsely confirm contact information in a frustrating effort to identify the caller. He did so after Blue Green had been identified by name five separate times on the May 27 call. And he also testified without qualification he believes deception is appropriate for a class representative. He didn't say in the calls. He didn't say in some circumstances. And two other district courts have entered judgments against Mr. Johanson, a summary judgment, because he made claims about an established business relationship or a consent at law. Is this in this record? It is. Are the, so Johanson. The statement that you just made, is that a part of this record? Which statement? That he's done this in other cases before. Oh, yes. National gas, most prominently, because it was decided before his deposition. And I asked him, do you agree that your behavior in national gas was deceptive? Yes. We have a couple of decisions where the courts have written about that. But I only saw one district court opinion where they went in through all this in Ohio. Is there others? The Ohio decision had been handed down before his deposition. So I questioned him about the Ohio decision. There is another. Is it in your brief? It is. It's Johanson v. e-commerce or something to that effect. E-financial, Johanson v. e-financial, 2022, WL168170, from the Western District of Washington. They make a good argument. Well, you're not going to ferret all this out if you don't have testers who are willing. And we've certainly seen that in the ADA, that you've got to have testers go into non-compliant facilities. I've written a lot of ADA tester cases. So the mere fact that you're trying to do this and trying to ferret this out is not deceptive. So how would somebody be a typical, I mean, this is clearly tester case material. And there's nothing wrong with testers. They get standing if they have the injury and they have the problem. So why is he not typical for a tester case? Well, I think that the tester cases involving discrimination under the ADA are different in part because they may not expect to use the service or expect to buy the good. They do suffer the harm of discrimination, which is a harm in and of itself that's been well-recognized across a huge range of statutes. Yeah, as soon as they walk in the store, and if it's a store they frequent or going back to, then it's done. Correct. I mean, if it's non-compliant, they can't get in. There's no way to, no access. And they suffer that harm in that instant, which is very separate from whether they're actually going to do the transaction or buy the service. Here, his behavior was an independent, intervening, complete cause. So Swan v. Secretary of State, again, is a situation where they weren't mailing out ballots to people in jails. And this court raised the Article III question, traceability question, of its own initiative, as it must, and held that because the jail inmate also had not provided the address of the jail himself, it could not have been mailed to him. In other words, the plaintiff's own ballot. I don't know that we need to go there. I think we just need to very narrowly look at this case and whether he's atypical or typical and just focus on typicality. That's all we have to do here. I agree. You need not do more. You don't have to go any further. I agree. And I would also say the district court's finding on adequacy was correct, but you need go no further. I agree. So before you leave, let me just ask you this question. So if you previously purchased a vacation package from Blue Green and you put your... Nine years ago, you're ineligible to put your name on the do not call list so that you don't receive any more calls from Blue Green. I mean... In 2005 FCC order cited in our brief, and it says there's an ongoing relationship, such as an account or even a magazine subscription, that EBR continues until you make a company-specific do not call request. I mean, is the ongoing relationship in perpetuity? Can you say, look, I don't want any more calls, please. I don't want any more calls. I want the do not call list. And Blue Green continues to call. Then does the established business relationship exception apply? That's what it is, according to the 2005 order. And on June 2nd, he did that. And then he never got called again. But how is there an ongoing account for 10 years? Because the regulation specifies that the transaction has to have been within 18 months of the call. Correct. And the FCC in 2005 order that was cited in our brief explains that the time limit is inapplicable for an ongoing relationship, such as a bank account or a magazine subscription. And that is an exception to the rule. Your argument is because there was still this credit for all these years that was an ongoing relationship? Right. As the order says, in terms of when you start that clock for counting the time period, you look at if it's an ongoing relationship. And we had substantial evidence it was. Intense factual issue that rendered Mr. Johanson atypical. But there was no dispute that there was no activity within that 10-year period. Is that right? Correct. All right. Thank you, Ms. Mead. Mr. Hogan, you've reserved some time for rebuttal. Thank you, Your Honor. They concede that the second call was a clear violation of the TCPA. And this is a consistent theme across statutory provisions that provide a private enforcement action for consumers, where the federal government has teamed up with consumers who are the closest to the harm to help enforce federal law, whether it's the AU testing cases, whether it's the False Claims Act, whether it's fair housing, whether it's antitrust, all of those statutory regimes empower the consumer to help the federal government enforce the law. And from the outset, the TCPA was enacted in 1991, right? In 1991, the FBI teamed up with a team of retirees to uncover illegal telemarketing. And they did exactly, with the federal government's endorsement, what Mr. Johanson did here. They said, we need you to pretend to be interested. We're going to record these calls. And we're going to find out who is behind these illegal calls. And the FTC, in another example, teamed up with Diana May, who is another consumer advocate like Mr. Johanson. And this is the FTC versus LifeWatch case. They came to her and they said, your expertise is what we need to find out if the agent is actually selling LifeWatch products. So what did they do? She actually made a purchase from the agent that confirmed that the agents were serving on behalf of LifeWatch. And then the FTC prosecuted its action. This is exactly the type of conduct that is not only required, but is in line with congressional intent to enforce the TCPA. In a couple other matters that I would like to address, the account info that the other side mentioned, it shows a zero balance. There was no credit. The Mr. Doucette testified in his deposition that it was an illusory credit that was a marketing tactic and a sales tactic. You cannot unilaterally impose a credit on a consumer without their knowledge and then have an ongoing transaction or financial transaction with their account to excuse violations of federal law. The NG&E case, I will just briefly address. In that case, the district court in a motion to compel arbitration said, I have some concerns about this plaintiff, Mr. Johansson, because it looks like he received a call and then called back. NG&E, a sharecropper. In response to the sharecropper, Mr. Johansson explained that there were two different agents who were working on behalf of NG&E. The first is who he received the initial call from. I see my time is up. If I can briefly conclude. The first call he received and called back, but then simultaneously he received different calls from another agent who had no idea that he had actually called back and established a business relationship with NG&E. And in its summary judgment order, it granted summary judgment for the defendants, but it was based on a rule of law that in his view, he established a business relationship extended to this other agent who was placing a separate call on behalf of NG&E. And so the credibility finding by the district court here is unmoored from the record in that case and quite frankly, unmoored from the record in this case. Thank you. All right. Thank you, counsel. Court is in recess until nine o'clock tomorrow morning. Thank you.